## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

DEBRA ANGELA DETTORE,

         CASE NO. 1:17-cv-10397
   *Plaintiff*,     MAGISTRATE JUDGE PATRICIA T. MORRIS
*v.*

COMMISSIONER OF SOCIAL SECURITY,

  *Defendant*.
_____/

## MAGISTRATE JUDGE'S OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 18, 21)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Dettore is not disabled. Accordingly, **IT IS RECOMMENDED** that Detorre Motion for Summary Judgment, (Doc. 18), be **DENIED**, the Commissioner's Motion, (Doc. 21), be **GRANTED**, and this case be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final and partially favorable decision by the Commissioner of Social Security granting Plaintiff Debra Angela Dettore's ("Dettore") claim for disability benefits since February 3, 2015—but not between the alleged onset date of January 31, 2013 and February 3, 2015—under the Disability Insurance Benefits program of Title II, 42 U.S.C. § 401 *et seq*. (Doc. 1). The case is before the undersigned magistrate judge pursuant to the parties' consent under 28 U.S.C. § 636(c), E.D. Mich. LR

72.1(b)(3), and by Notice of Reference. (Docs. 12, 13). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 21).

On October 10, 2013, Dettore filed an application for DIB alleging a disability onset date of January 31, 2013. (Tr. 152-59). The Commissioner denied her claim. (Tr. 87-96). Dettore then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on May 6, 2015, before ALJ Anthony Smereka. (Tr. 28-69). Near the end of the hearing, the ALJ referred Dettore to another consultative examiner, (Tr. 68), Ms. Rosenzweig, whose opinion was then introduced into the record. (Tr. 636-48). Dr. Rizzo, one of Dettore's treating sources, responded to Ms. Rosenzweig's opinion, and his response was introduced into the record as well. (Tr. 649-50). The ALJ's partially-favorable written decision, issued November 10, 2015, found Dettore disabled as of February 3, 2015, the date she attained the age of 55, but not disabled between her alleged onset date and February 3, 2015. (Tr. 8-27). On December 5, 2016, the Appeals Council denied review, (Tr. 1-3), and Dettore filed for judicial review of that final decision on February 7, 2017. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we condiser our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner

is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Dettore disabled as of February 3, 2015, the date she attained the age of 55, but not disabled between her alleged onset date of January 31, 2013, and February 3, 2015.. (Tr. 8-27). At Step One, the ALJ found that Dettore last met the insured status requirements of the Social Security Act on December 31, 2017, and had not engaged in substantial gainful activity in the interval between her alleged onset date of January 31, 2013 and her date last insured. (Tr. 14). At Step Two, the ALJ concluded that the following impairments qualified as severe: depression with anxiety, cervical and lumbar degenerative disc disease, and arthritis of the carpal and metacarpal joints of the thumbs. (Tr. 14-15). The ALJ also decided, however,

that none of these met or medically equaled a listed impairment during the relevant time period between the alleged onset date and the date she attained age 55 at Step Three. (Tr. 15-16). Thereafter, the ALJ found that during this relevant time period Dettore had the residual functional capacity ("RFC") to perform light work except

> she is further limited to standing and walking for 6 out of 8 hours; sitting for 6 out of 8 hours; no exposure to hazards, including dangerous moving machinery or unprotected heights; no climbing of ladders, ropes, and scaffolds; no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; no crawling; no driving in the course of employment; no concentrated exposure to vibration; no constant handling or fingering; limited to unskilled, simple, routine and repetitive work.

(Tr. 16). At Step Four, the ALJ found Dettore incapable of performing her past relevant work. (Tr. 20). Proceeding to Step Five, the ALJ determined that prior to February 3, 2015, there were jobs that existed in significant numbers in the national economy that Dettore could have performed. (Tr. 21-22).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has reviewed Dettore's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### i.    Function Report

On September 16, 2013, Dettore filled out a Function Report that appears in the administrative record. (Tr. 196-203). Describing her conditions, she noted "continual pain in my neck affecting range of motion" and her "ability to drive safely," as well as "pain

and tingling in both hands" that affected her ability to grip or hold objects. (Tr. 196). "I experience dizziness and my medications cause me to be lethargic and very shaky as well as confused and disoriented. Without medications, I am in severe pain; sleep is disruptive and fatigue sets in." (*Id.*). Each day she would wake up, spend ten to fifteen minutes "orient[ing] myself; I get up, take care of personal needs, fix light meal; take medications; watch TV, use computer, attend doctor appointments if necessary, do light chores, check email, pay bills, fix light lunch, nap, fix light dinner, and meds." (Tr. 197). "Sleep is fragmented due to pain." (*Id.*). In addition, her conditions impacted her ability to dress, bathe, care for her hair, shave, and use the toilet. (*Id.*).

Although she avoided preparing any meal "requiring long periods on [her] feet," she continued to make sandwiches, microwavable meals, cereal, and toast. (Tr. 198). Doing so took "hours due to limited energy and pain when standing." (*Id.*). She attributed this to "[l]imited concentration" and an inability "to stand for long periods cooking or cleaning up." (*Id.*).

She also experienced difficulty with house and yard work, and could do "no indoor chores due [pain caused by] bending, reaching or lifting . . . ." (*Id.*). Friends and neighbors assisted her. (*Id.*). Nevertheless, she retained the ability to drive a car and could do so alone over short distances. (Tr. 199). She shopped in stores for necessities, and the time it took varied—"my son will do the heavy bulky shopping for items I cannot handle." (*Id.*). She also handled her finances "with some assistance." (*Id.*). "I always kept meticulous books and accounts; now I cannot stay focused." (Tr. 200).

To relax, she would read, watch television, or research on the computer on a daily basis "for short periods of time due to pain and discomfort; must change positions; thus changing up my routines." (*Id.*). Occasionally she would "meet friends for short meals" and "visit with family and friends on the phone" about twice per month. (*Id.*). She also tried to attend church services at least twice per month. (*Id.*). "Attendance at holiday events is determined by my pain level." (*Id.*).

Prompted to mark abilities with which she struggled, she marked: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, memory, completing tasks, concentration, understanding, following instructions, and using her hands. (Tr. 201). "I am unable to turn my neck; my hands go numb and tingle, I have pain in my back if standing or climbing. I cannot concentrate for long periods of time, reaching, kneeling cause pain. [M]y memory is not the same, I have trouble completing tasks in a reasonable time." (*Id.*). She could walk approximately 80 feet before needing five to ten minutes' rest. (*Id.*). She could only pay attention for "[a] few minutes." (*Id.*). Due to her trouble concentrating, she did not follow written or spoken instructions well. (*Id.*). When faced with stress, she noted that "[i]t adds to my level of pain and I become anxious and immobile." (Tr. 202). "I fear I will never return to the life I had before the injury." (*Id.*).

Family friend Daniel G. Vettraino also filled out a Third-Party Function Report. (Tr. 205-13). The information provided therein is consistent with that provided in Dettore's Function Report.

### ii.	Dettore's Testimony at the Administrative Hearing

The ALJ opened the hearing with questions to Dettore about past work. (Tr. 32-38). In one job, which involved a considerable amount of heavy lifting, she "got hurt" and "went and got workers comp." (Tr. 39). In the settlement, she received a "gross amount" of "$58,370." The ALJ provided that "[i]f I approve benefits, that . . . should be uploaded to the file. It doesn't really matter when, but before they'll effectuate the decision, if this is a favorable claim, if there's any note or hint of workers comp, and usually, when you're dealing with city government or county government . . . they'll ask for that information because there's certain offsets as to work loss." (Tr. 40-41).

Dettore's counsel chimed in to ask about Dettore's pain medication. (Tr. 43). Dettore noted that she took Norco, Valium, and Neurontin to ease pain in her neck and back. (Tr. 44). "My neck burns. It is a constant burning, pulling. It's very aggravating. I can't—when I go to carry something, it will immediately burn." (*Id.*). In addition, issues with her lower back and sides prevented her from "sit[ting] for periods of time" or "sleeping well, . . ." (*Id.*). At most, she could sleep for "[a]bout an hour, hour and a half, and I get up." (Tr. 47). She described an ability to sit or walk for "maybe 10 minutes" at a time. (Tr. 45). Her carpal tunnel also affected her ability to grip. (*Id.*). "If I'm carrying something, I will break my grip. I've broken several things, I can't use the computer, . . ." (*Id.*). She enjoyed only a "[v]ery limited" capacity to drive, though "I have a car." (Tr. 46). Ultimately, she avoided driving due to her "pain medication," and was instructed "not to drive" when taking it. (*Id.*). Thereafter, Dettore described a typical day:

> I get up—I don't get out of bed immediately because I have to lay there for a while, and I have to—I'm immobile. After I do that, after lay down there for a while, I'll get up and I'll have a little bit of breakfast. I might read the paper, but again, it makes my neck burn, and any kind of position long—focused on the—anything long, like, at that other job, I couldn't get on that computer like that because it would burn me.

(Tr. 47-48). At the time of the hearing, she was living with her cousin. She indicated that her cousin did all the housework and grocery shopping, although Dettore accompanied her "as a passenger . . . ." (Tr. 49). Around "[n]oon and dinnertime," Dettore would put "dishes in the dishwasher, make something little for food, and that's it." (*Id.*). "Evening, same thing. You know, a little food or snack." (*Id.*). Dettore also lived with her mother and son. (Tr. 50). Her mother could care for herself, and her son would "be there to do the heavy work" when Dettore finally moved into her own home. (*Id.*).

Dettore attended doctors' appointments "[o]nce a month or once every other month." (Tr. 51). Counsel asked about Dr. Rizzo's diagnoses of "[m]ood swings, depression, [and] anxiety." (Tr. 52). Dettore explained that "I drop my social, I don't like to drive much, so I used to go to church. I can't sit there for an hour, hour and a half, kneeling. I don't spend time and socialize anywhere with my friends. I don't like to drive at nighttime, and I'm depressed about it." (*Id.*). In reference again to the workers compensation settlement alluded to earlier, counsel clarified: "[T]he decision to retire you was the county's decision, and you agreed with it, that you could no longer work?" (*Id.*). Dettore replied, "Yes, that's correct." (*Id.*). One of the reasons she did not return to work was that she faced harassment in the workplace. (Tr. 53).

Asked about her functional abilities, Dettore indicated she could not walk a block without stopping, and could not lift a gallon of milk. (Tr. 58). And asked how she would describe her pain a scale of one to ten, she said "[m]y pain on a daily basis is 10. Emergency pain would be, like, 12, 15." (Tr. 59).

### iii.        The VE's Testimony at the Administrative Hearing

The ALJ posed his first hypothetical to the VE as the following: "[P]lease assume a ability to perform light level of work. Light work, of course, involves lifting no more than 20 pounds occasionally, lesser ways of 10 pounds more frequently. It also assumes the ability to stand and walk at least six out of eight hours and the ability to sit the same amount of time. However, this person should not work around hazards or be exposed to hazards. And that includes work at unprotected heights around dangerous, moving machinery, and no climbing of any ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs; no more than occasional balancing, stooping, kneeling, crouching, but no crawling; no driving in the course of employment; no concentrated exposure to vibration; no constant handling or fingering. If you were to assume these restrictions, would that be preclusive of the past work[?]" (Tr. 64). The VE indicated that these limitations "would not be preclusive of the office clerk job." (*Id.*). The ALJ altered the hypothetical somewhat, asking whether a sit/stand option would change the answer given. (Tr. 65). The VE noted that such a limitation would preclude work at such a job. Other jobs would exist in the national economy, including: "packaging jobs"—with 1,600 regional job availabilities and 26,000 national job availabilities—"sorting jobs"—with 320 regional job availabilities and

6,000 national job availabilities—"industrial processing and finishing jobs"—with at least 600 regional job availabilities and 9,000 national job availabilities. (Tr. 65-67).

Next, the ALJ wondered whether additional restrictions "of no more than a sedentary level of work with all of these other restrictions as well, would there be any jobs?" (Tr. 67). The VE confirmed that sedentary work would be available, including "a security field, lobby attendant, gate attendant, security monitor"—with 800 regional job availabilities and 25,000 national job availabilities—"parking facility cashier"—with 1,000 regional job availabilities and 30,000 national job availabilities—"bench jobs at sedentary, assembly, sorting, product finishing"—with 2,000 regional job availabilities and 30,000 national job availabilities—"sorting[] jobs"—with 320 regional job availabilities and 6,000 national job availabilities—and "product processing jobs"—with 600 regional job availabilities and 9,000 national job availabilities. (Tr. 67).

In concluding, the ALJ told Dettore "I would like you to be seen by two more physicians. I know it's going to be difficult, but I feel that this additional examinations [sic] would be beneficial for me to help me evaluate your claim." (Tr. 68).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.*

§ 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic

techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish

the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.    Analysis

Dettore furnishes two discrete arguments in her Motion for Summary Judgment: (1) the ALJ failed to appropriately weigh opinions from treating sources Dr. Rizzo and Dr. Steinberg, as well as consultative examiner Dr. Rojas, (Doc. 18 at ID 706-13); and (2) the ALJ improperly discounted Dettore's credibility, (Doc. 18 at ID 713-15). I address each argument in turn.[1]

### 1.    The Weight Accorded Medical Sources

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating*

---

[1] Dettore also mentions that in the Sixth Circuit, "a disability determination made by another governmental agency constitutes relevant evidence, to be considered as part of the medical record presented by the Plaintiff," and suggests that "the ALJ's failure to consider this determination represents further reversible error." (Doc. 18 at ID 708). She declines to provide any citation to the record or elaborate on this argument whatsoever in her motion. Her Response, filed October 9, 2017, seems to regard the Commissioner's focus on this passage as "totally non-sequitur [sic]" and an attempt to distract this Court from her true argument that Dr. Rizzo's opinion deserved more weight. (Doc. 25 at ID 755-56). He then parlays this argument into his larger point that Dr. Rizzo's opinion should have been given more weight. As I discuss above, Dr. Rizzo's

source's opinion." *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

In the instant case, Dr. Rizzo treated Dettore's mental conditions, while Dr. Steinberg and Dr. Rojas each opined on her physical conditions. Dettore tailors her challenges accordingly.

###    i.    Dr. Rizzo

Dettore notes that Dr. Rizzo's treating relationship with her began in December 2012, and argues that his treatment records, medical source statement, and response to Ms. Rosenzweig's later consultative examination conclusively show disability. (Doc. 18 at ID 706-10). She further argues that the ALJ should have deferred to his opinion because "it is supported by objective evidence and uncontradicted by substantial evidence in the record." (Doc. 18 at ID 709). In illustrating this argument, she cites the Global Assessment of Functioning ("GAF") score of 49 he assigned her, as well as an older DDS "psychological report prepared by Susan M. Kenna" diagnosing "'adjustment disorder with anxiety and depression.'" (Doc. 18 at ID 707) (quoting (Tr. 413-15)).

I first note that the evidence Dettore cites as support for her argument carries little persuasive force. Indeed, diagnoses in themselves do not *per se* suggest any amount of severity, and in any case, the ALJ found Dettore's anxiety and depression to be severe impairments. *See, e.g.*, *Flowers v. Comm'r of Soc. Sec.*, No. 14-CV-12449, 2015 WL 4274961, at *4 (E.D. Mich. July 14, 2015) ("[T]he MRI and the CT scan reports provide no insight into what additional limitations Plaintiff may suffer from based on the diagnoses therein."); *cf. Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399 (6th Cir. 2016) ("To the extent these vague arguments suggest that the ALJ failed to explicitly apply 12-2p's diagnostic criteria for determining whether a claimant has an MDI of fibromyalgia, such error—to the extent it exists—is harmless given that the ALJ concluded (1) that Plaintiff *did* have fibromyalgia, and (2) that her fibromyalgia constituted a 'severe impairment' under the second step of the five-step analysis."). With respect to the GAF score, the Sixth Circuit has held that such a score will not undermine an ALJ conclusion supported by substantial evidence if given due consideration. *See Richardson v. Comm'r of Soc. Sec.*, 570 F. App'x 537, 539 (6th Cir. 2014) ("Richardson's GAF scores, standing alone, are insufficient to undermine the ALJ's decision . . . and, given that the ALJ properly considered the medical opinion evidence and other evidence in the record, the disability determination was supported by substantial evidence."). Such is the case here, as the ALJ provided numerous good reasons for discounting Dr. Rizzo's opinion. (Tr. 18-19).

The ALJ noted, for instance, that Dr. Rizzo "appears [to have] relied quite heavily on the subjective reports of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (Tr.

18). Of note, he cites Dr. Rizzo's response to Ms. Rosenzweig's consultative examination, which Dettore implies the ALJ did not consider. (*Id.*) (citing (Tr. 650)). Dr. Rizzo's treatment notes omit reference to objective testing and include phrasing that would tend to corroborate the ALJ's finding. *E.g.* (Tr. 606) (reporting in straightforward fashion Dettore's complaints that she "continues to feel anxious, tense, depressed—worried due to all her limitations [and] chronic pain"). And, as is discussed at some length below, the ALJ mentions that Dettore's lack of credibility in turn contributes to the lack of supportability in Dr. Rizzo's findings. (Tr. 18). Moreover, ALJ observed that "the only mental status examination" from Dr. Rizzo shows Dettore exhibiting "cooperative behavior, appropriate grooming, attire, affect, and thought content; and normal memory, orientation, and thought process, which does not support the extreme limitations given by Dr. Rizzo . . . ." (Tr. 18-19); *see also, e.g.*, (Tr. 447, 450, 456, 466, 511, 577) (normal or appropriate behavior); (Tr. 447, 450, 456, 511, 558, 577, 581, 584, 643) (adequate grooming and/or attire); (Tr. 450, 456, 466, 511, 526, 528, 576, 577, 580-81, 583-84, 625, 643-44) (normal memory, orientation, and/or thought content). His later letter, which the ALJ explicitly addressed, merely restates the conclusions expressed in his earlier medical source statement. (Tr. 18) (citing (Tr. 649-50)). Even if substantial evidence could have supported a more favorable finding as to Dr. Rizzo, the ALJ was entitled to weigh the evidence as he did, and this Court is not entitled to reweigh that same evidence. *See, e.g.*, *Murray v. Comm'r of Soc. Sec.*, No. 12-15691, 2014 WL 1328163, at *3 (E.D. Mich. Mar. 31, 2014) ("The Court's task is not to reweigh the evidence, or even to determine if the record would support the plaintiff's version of the facts. The Court may only determine if the ALJ's 'good reasons' for rejecting

the opinion of a treating source were good enough, . . .”). Here, the ALJ supplied good reasons to discount Dr. Rizzo's opinion.

Dettore also mentions that in the Sixth Circuit, "a disability determination made by another governmental agency constitutes relevant evidence, to be considered as part of the medical record presented by the Plaintiff," and suggests that "the ALJ's failure to consider this determination represents further reversible error." (Doc. 18 at ID 708). She declines to provide any citation to the record or elaborate on this argument whatsoever in her motion. The Commissioner addressed this stray paragraph in its motion, speculating she was not "referring to the June 2015 letter of treating psychologist Dr. Rizzo that she mentions in the preceding paragraph of her brief . . . since the ALJ discussed that letter . . . and there is no indication that Dr. Rizzo issued his letter on behalf of any governmental agency; to the contrary, his letter is issued on the letterhead of a private L.L.C." (Doc. 21 at ID 728-29) (internal citations omitted). Having made this assumption, the Commissioner responds to the possible argument that the ALJ failed to discuss the December 2013 consultative examination report of Ms. Kenna and Dr. Mills. (Doc. 21 at ID 729). Dettore's Response, filed October 9, 2017, seems to regard the Commissioner's rebuttal as "totally non-sequitur [sic]" and an attempt to distract this Court from her true argument that Dr. Rizzo's opinion deserved more weight. (Doc. 25 at ID 755-56). She then parlays this argument into her larger point that Dr. Rizzo's opinion—including his letter responding to the later consultative examiner, Ms. Rosenzweig—should have been given more weight.[2] As I

---

[2] To be clear, the record does not contain any disability determination by another governmental agency. Such determinations, as Dettore correctly notes, require consideration by ALJs. SSR 06-

discuss above, Dr. Rizzo's opinion and letter were given due consideration by the ALJ, who supplied good reasons for rejecting it. (Tr. 18-19).

For these reasons, Dettore fails to demonstrate any error warranting remand in the ALJ's consideration and discussion of Dr. Rizzo's opinion. The Court should decline her invitation to findlol one.

### ii.    Dr. Steinberg and Dr. Rojas

In criticizing the ALJ's treatment of Dr. Steinberg and Dr. Rojas, Dettore takes a similar tack. She suggests that the ALJ did not properly consider treating physician Dr. Steinberg's decision to prescribe "narcotic pain medication," (Doc. 18 at ID 713), a decision Dr. Rojas "did not question" over the course of "her two-consultative examination [sic]," (Doc. 18 at ID 714). In addition, Dettore marshals citations from Dr. Steinberg's and Dr. Rojas's opinions that reflect similar diagnoses as evidence that neither opinion was, in fact, inconsistent with medical evidence of record.

As with Dr. Rizzo, the ALJ provided "good reasons" to discount Dr. Steinberg's opinion by pointing out that inconsistencies pervaded his treatment notes:

> Partial weight is given to Dr. Steinberg's statements because he is a treating provider who examined the claimant on multiple occasions; however, the severity of these limitations is not fully supported by Dr. Steinberg's treatment notes, which indicate only reduced range of motion in the cervical spine but

---

03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006) ("[E]vidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered."); *e.g.*, *Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 717 (S.D. Ohio 2012) ("While the decision of another governmental agency is not binding on the ALJ . . . the ALJ must consider such evidence." (internal citation omitted)). A consultative examiner's report does not qualify as a disability determination by another governmental agency. Nor does a psychologist's reaction— printed on a private letterhead—to a consultative examiner's report.

> otherwise normal muscle bulk and tone, no focal weakness throughout,
> normal sensation, and normal gait and balance . . . .

(Tr. 19-20); *e.g.*, (Tr. 447,450, 453, 456, 459, 462, 466, 577, 581) (normal muscle bulk and tone); (Tr. 453, 456, 459, 462, 465) (little or no weakness); (Tr. 447, 453, 459, 462, 466, 559, 577, 581, 584, 625, 643) (competent gait). In other words, the function report Dr. Steinberg submitted—a check-box form, no less—did not align with his treatment notes. (Tr. 618-21). One might observe that this reasoning centers on *internal* inconsistency "between the doctor's opinions and portions of her reports," which is a factor "properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight," *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013)— nevertheless, the ALJ also explicitly discussed "the generally unremarkable objective findings in the record" and history of "conservative" treatment of Dettore's symptoms, (Tr. 17). The objective evidence to which the ALJ referred originated from Dettore's treatment under Dr. Steinberg. (Tr. 572-86). To the extent the ALJ erred in failing to explicitly specify why Dr. Steinberg's opinion deserved only partial weight before expounding upon this factor, this earlier evidentiary discussion renders that error harmless. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (explaining that an ALJ may meet "the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the regulation"); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("Thus the procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the

rule may sometimes be excused."). This conclusion is particularly appropriate where, as here, the claimant does not in fact elaborate on *why* the reasons provided by the ALJ were not 'good,' beyond scrawling rote affirmations of the treating physician rule and repeatedly mentioning—as the ALJ plainly recognized and discussed, (Tr. 17)—that Dr. Steinberg prescribed narcotic medication to her, (Doc. 18 at ID 712).

Unlike Dr. Steinberg, Dr. Rojas was a consultative examiner and not a treating physician. In discounting Dr. Rojas's opinion, the ALJ was only required to explain his weight assignment enough to "allow[] a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). This he did, citing (as with Dr. Steinberg) the inconsistency between the "significant restrictions" he assessed and "his examination findings showing that the claimant is capable of postural movement, has normal reflexes throughout the upper extremities, has a stable gait within normal limits, and only slightly limited range of motion in the lumbar and cervical spine." (Tr. 19). *Compare* (Tr. 623-25), *with* (Tr. 626-35).

For these reasons, the ALJ did not err in his weight assignments and the Court should decline to remand on such ground. To the extent Dettore avers error because her *own* testimony was consistent with Dr. Steinberg's and Dr. Rojas's conclusions, such a claim should fail. As mentioned above, this Court may not reweigh the evidence. *See Murray*, 2014 WL 1328163, at *3. Moreover, as will be shown, substantial evidence bolsters the ALJ's adverse credibility finding.

## 2.     Credibility

Dettore's final argument appears only obliquely in the latter part of her Motion, where she supposes that the ALJ did not properly engage in the two-pronged test for gauging a claimant's evaluation of pain. (Doc. 18 at ID 713-15). In *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997), the Sixth Circuit reiterated its two-pronged test for evaluating claimants' allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Id.* at 527 (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994)). However, as Dettore correctly notes that an ALJ may not disregard "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work . . . solely because they are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).

Unfortunately for Dettore, the ALJ structured his analysis as required per *Walters*, and his discussion makes clear that he relied on more than the lack of corroborating evidence in discounting Dettore's credibility. (Tr. 17). He noted, for instance, that the record contained evidence that she "exaggerated" her symptoms, including her ability to sit comfortably before the consultative examiner, and statements that she was exercising and capable of lifting groceries. (*Id.*); (Tr. 582, 643). Thereafter, he *also* observed that her physical conditions yielded only mild objective evidence, and received primarily

conservative treatment. (Tr. 17); (Tr. 475-76, 550, 552, 572-73) (mild objective evidence); *e.g.*, (Tr. 449, 459, 464, 466, 510, 575, 584) (conservative treatment). This combined rationale is entirely permissible, and courts in this circuit routinely find similar reasoning adequate. *E.g.*, *White v. Comm'r of Soc. Sec.*, No. 10-14365, 2011 WL 5104622, at *3 (E.D. Mich. Oct. 27, 2011) (lack of corroborating evidence is relevant to the credibility of a claimant's statements); *Wells v. Astrue*, No. CIVIL 09-78-GFVT, 2009 WL 3789006, at *4 (E.D. Ky. Nov. 12, 2009) ("Finally, and most supportive of the ALJ's credibility determination, the ALJ noted that the record evidence did not corroborate Wells' claims.").

Put simply, the ALJ supplied a cohesive rationale for her adverse credibility determination, buttressed by substantial evidence, and this Court should not disturb it. *See generally Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997))).

H.      **Conclusion**

For the reasons stated above, the Court **RECOMMENDS** that Dettore's Motion for Summary Judgment, (Doc. 18), be **DENIED**, the Commissioner's Motion, (Doc. 21), be **GRANTED**, and this case be **AFFIRMED**.

## III.  REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 19, 2017                   S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 19, 2017                    By s/Kristen Castaneda
                                          Case Manager